<u>FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | MDL No. 1337 |
| NAZI ERA CASES AGAINST GERMAN DEFENDANTS LITIGATION | D.N.J. Lead Civ. No. 98-4104 (WGB) |
| This Matter Relates To: | |
| Ronald Mandowsky et al., | |
| Plaintiffs, | Civ. No. 00-4986 (WGB) |
| v. | O P I N I O N |
| Dresdner Bank AG, | |
| Defendant. | |

**APPEARANCES:**

Paul E. Kerson, Esq.
**LEAVITT, KERSON & DUANE**
99 Park Avenue, Suite 800
New York, NY 10016

        Counsel for Plaintiffs

William M. Barron, Esq.
**ALSTON & BIRD LLP**
99 Park Avenue
New York, NY 10016-1387

Thomas R. Valen, Esq.
**GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, P.C.**
One Riverfront Plaza
Newark, New Jersey 07102-5497

        Counsel for Defendant

**BASSLER, SENIOR DISTRICT JUDGE:**

Plaintiffs Ronald Mandowsky and Seth Feldman (collectively as "Plaintiffs") move to set aside their December 19, 2000 Stipulation of Dismissal with Prejudice.  Plaintiffs brought this action for compensation for property allegedly confiscated by defendant Dresdner Bank Aktiengesellschaft ("Dresdner Bank") as an agent of Nazi Germany.  The property was located in what was formerly East Germany.

## I. BACKGROUND

### A.    The Nacher Family Claims

Plaintiffs are the grandnephews and great-grandnephews of Ferdinand Nacher and Ignatz Nacher, respectively.  Plaintiffs, as the heirs of Ferdinand and Ignatz, purport to be the rightful owners of property stolen by Dresdner Bank from their great-uncle Ignatz and now demand restitution.  In 1934, Dresdner Bank, as affiliated with Nazi Germany, allegedly seized at gunpoint the majority stock certificates in Engelhardt Breweries from Ignatz Nacher, President of Engelhardt.  (See Kerson Affidavit Ex. I, Original Complaint at ¶ 6; Ferdinand Nacher Affidavit (attached to Plaintiffs' Reply Memorandum) at ¶ 1.)  Ignatz developed Engelhardt from its humble beginnings into a major brewery.  (See William Barron Declaration, Ex. 3, Translation of the January 8,

1993 Berlin Court Decision at 3.)[1]  After stealing his stock

holdings, the Nazis deported Ignatz to Switzerland where he died

in 1939.  (Ferdinand Nacher Affidavit at ¶ 2; Kerson Affidavit

Ex. A, May 25, 2004 International Organization for Migration

Decision ("IOM Decision") at ¶ 3.)  Soon thereafter, Ferdinand

Nacher, Ignatz's nephew and vice-president of Englehardt, fled to

Belgium.  (Id. at ¶ 5.)  Ferdinand made his way to the United

States, served in the Army from 1943-1945 and became a citizen.

(Id.)  In 1956, Ferdinand was appointed Executor of Ignatz

Nacher's estate.  (Kerson Affidavit Ex. I, Original Complaint at

¶ 4.)  From that date, Ferdinand pursued claims to Ignatz's

stolen property in the courts of Germany and the United States.

(Id.)

      Ferdinand, represented by counsel at the time, settled a

portion of the claims to the Nacher family property with Dresdner

Bank in a West Berlin Court in 1956.  (Plaintiffs' Reply Br. at

3; William Barron Declaration, Ex. 5, Translation of the December

18, 1956 Settlement Agreement at 21.)  The 1956 settlement

agreement provided that "all claims of . . . the Ignatz Nacher

estate, on the one hand, and the Dresdner Bank . . ., on the

other hand, are settled.  Thus, not only are the principal claims

settled, but also any entitlements to compensation and subsidiary

---

[1]  Dresdner Bank submitted the William Barron Declaration as
part of its original Motion to Dismiss on October 6, 2000.

claims that might somehow arise." (William Barron Declaration, Ex. 5, Translation of the December 18, 1956 Settlement Agreement at 5.)

Notwithstanding the 1956 settlement agreement, in 1990 Ferdinand Nacher filed a petition for restitution against Dresdner Bank in the Berlin District Court. The Berlin Court declared that the 1956 settlement "materialized effectively," and contrary to Ferdinand Nacher's allegations of deceit, the hearing "was not infringed upon." (William Barron Declaration, Ex. 3, Translation of the January 8, 1993 Berlin Court Decision at 19, 21.) The Court observed:

> Insofar as [Ferdinand Nacher as the third party petitioner] lays claims to the purchase prices for the interests transferred, as well as the company properties transferred and the vehicle fleet . . . , it should be noted that his right as executor goes no further than that of the decedent [Ignatz Nacher]. [Ignatz Nacher] was owner of neither the Engelhardt-Brauerei AG nor the Groterjahn-Brauerei AG and the land and fleets belonging thereto, nor the other breweries set forth in the demand . . . . As a major stockholder of a corporation and as its chairman of the supervisory board he could steer the purchase and sale of breweries and real estate. But the profits from the sales didn't accrue to him, but rather the company represented by him. The profits came to him only through dividends. It operates the same for [Ferdinand Nacher as the third party petitioner] and the heirs represented by him with respect to the Engelhardt-Brauerei shares reimbursed to them in the settlement. He/they are not entitled to claims against the company for reasons of business politics.

> A cancellation of the basis of a
> transaction, which could have the consequence
> that the settlement would have to adapt to
> the new conditions, did not take place.  The
> possessions of the Engelhardt-Brauerei did
> not abruptly increase through the
> reunification of Germany.  The third party
> petitioner himself doesn't state that parcels
> of land of the Engelhardt-Brauerei AG were
> dispossessed in East Berlin.

(Id. at 25.)

On January 8, 1993, the Court denied Ferdinand Nacher's claims for restitution "insofar as they overstep[ped] the settlements arrived at on December 18, 1954." (Id. at 2.)

On April 13, 1994, Ferdinand filed a complaint against Dresdner Bank, as a foreign bank authorized to do business in New York, in the Supreme Court of New York demanding damages of $25 billion ($25,000,000,000.00).  (Kerson Affidavit Ex. I, Original Complaint at ¶¶ 2, 4.)  Ferdinand Nacher died in November 1996, naming his grandnephews, Plaintiffs, to continue in his place as co-executors of his estate.  (Kerson Affidavit Ex. G, Last Will and Testament of Ferdinand Nacher at ¶¶ 3, 6.)

On August 15, 2000, Dresdner Bank removed the lawsuit to the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. §§ 1331 and 1441.  Dresdner Bank argued that the case became removable when the Governments of the United States and the Federal Republic of Germany entered into an Executive Agreement on July 17, 2000, pursuant to which Germany and German Industry created a Foundation, discussed *infra*,

entitled "Remembrance, Responsibility and the Future" (the "Foundation").  (See Reply Declaration of William Barron, Ex. A, Dresdner Bank's Notice of Removal at ¶¶ 6, 7.)[2]  Specifically, Dresdner Bank averred that the Executive Agreement enmeshed the Plaintiffs' claims with a substantial question of federal law. (Id. at ¶¶ 8-10.)  The suit was then transferred here by order of the Multidistrict Litigation Panel and consolidated amongst approximately fifty similar cases "so that the Court could consider the impact of the German Foundation 'Remembrance Responsibility and the Future'" on the many civil suits being pursued in U.S. courts by Holocaust victims.  In re Nazi Era Cases Against German Defendants Litigation, 213 F. Supp. 2d 439, 442 (D.N.J. 2002); see Multidistrict Litigation Panel Transfer Order, Docket No. 1337, 2000 U.S. Dist. LEXIS 11650 (August 4, 2000).

**B.   The Creation of the Foundation**

The Foundation, examined at length in In re Nazi Era Cases Against German Defendants Litigation, was the result of an international effort led by Germany, the United States, and Israel to efficiently resolve the highly sensitive and numerous "claims for restitution and compensation arising out of the Holocaust."  See 198 F.R.D. at 431-35 (internal citations

---

[2]   Submitted as part of Defendant's Reply to its Motion to Dismiss, see supra note 1.

omitted).  As part of the extensive and historic negotiations
that took place, it was agreed that in exchange for the creation
of a 10 billion Deutsche Mark fund supporting the Foundation by
the German Government and German industries, id. at 432-33,
plaintiffs with pending lawsuits in the United States "promised
dismissal with prejudice of all Holocaust-related litigation
against German defendants pending in American courts (referred to
as 'legal peace' by the parties). . . ."  213 F. Supp. 2d at 443;
see also 198 F.R.D. at 430.  The Foundation promised to provide
Holocaust-era victims, or their heirs, with a "non-bureaucratic
[and] non-adversarial" alternative means for recovery.  198
F.R.D. at 433.

On August 12, 2000, Germany promulgated the law creating the
Foundation as a legal entity with the purpose of "respond[ing] to
the moral responsibility of German business arising from the use
of forced laborers and from damage to property caused by
persecution, and from all other wrongs suffered during the
National Socialist era and World War II." (Kerson Affidavit,
Exhibit E, Executive Agreement between the Government of the
Federal Republic of Germany and the Government of the United
States of America concerning the Foundation, "Remembrance,
Responsibility and the Future" at 2); id. at 432.  The newly
formed Foundation law provided that "[e]ligible claimants [would
be] either those who personally were victims, or the heirs of

7

victims who died after February 16, 1999." Id. at 433 (citing
*Gesetz Zur Errichtung Einer Stiftung* "*Erinnerung; Verantwortung
und Zukunft*" Translated as "Law of the Creation of a Foundation
'Remembrance, Responsibility and Future'" at § 13).  Those
eligible would be entitled to different amounts of recovery
depending on the harm they or their family members endured.  Id.

Overwhelmingly, the plaintiffs in U.S. courts sought
voluntary dismissal with prejudice, examined in the Court's
December 5, 2000 opinion, to pursue their claims with the
Foundation.

### C. Dismissal of Plaintiffs' Claims in the United States and the Subsequent Decisions by the Foundation

On October 10, 2000, Dresdner Bank filed a motion to dismiss
Plaintiffs' complaint based on, *inter alia*, the political
question doctrine, comity and the doctrine of *res judicata*.
Plaintiffs responded on October 25, 2000 with a cross-motion to
remand the suit to the New York state courts.  Plaintiffs argued
that "[they] were especially careful not to state any federal
questions whatsoever in the initial State Court Summons and
Complaint [because] Plaintiffs fully anticipated that [Dresdner
Bank] would wrongfully enlist the United States Government on its
side." (Plaintiffs' Memorandum of Law in Support of Their Motion
for Remand to the State Court and in Opposition to Defendant's
Motion to Dismiss at 22.)  They urged the Court to ignore the
1993 Berlin Court decision and deny Dresdner Bank's motion to

8

dismiss.

The Court held oral argument on November 13, 2000.  On
December 19, 2000, prior to the Court reaching its decision on
the parties' cross-motions, Plaintiffs voluntarily dismissed this
action and pursued their claims via the newly established
Foundation.[3]  Plaintiffs presented their claims for Ignatz
Nacher's stolen shares of Engelhardt Breweries to the
International Organization for Migration ("IOM"), one of several
partner organizations to the Foundation handling "actual
collection and processing of applications, and the distribution
of payments."[4]  198 F.R.D. at 433 & n.12.  The IOM twice rejected

_____

[3]  In March 2002, Plaintiffs and other similarly situated
parties, filed a Motion to Enforce Settlement and for Declaratory
Relief.  "In the most general terms, Plaintiffs allege[d] that
German Industry [had] failed to meet its obligations to make
appropriate interest payments to the Foundation.  Accordingly,
Plaintiffs . . . asked the Court to interpret the parties' rights
and obligations under the German Foundation law, and . . . asked
the Court to order German Industry to make additional payments to
the Foundation . . . pursuant to Fed. R. Civ. P. 60(b)."  213 F.
Supp. 2d at 442.  On July 23, 2002, the Court denied their motion
because "[it] did not retain jurisdiction to enforce settlement
in [the] disputes . . . [and because] the narrow post-dismissal
avenue of relief left open pursuant to Rule 60(b) [did] not give
the Court the authority to issue the declaratory orders that
Plaintiffs [sought]."  Id. at 447-48.  The Court noted that "it
will not entertain any independent actions directed to the
conduct of the Foundation . . . the Court is absolutely certain
that matters pertaining to the operation of the Foundation are
beyond the purview of American courts, and must be resolved via
existing mechanisms in Germany."  Id. at 447 n.11 (emphasis
added).

[4]  Paragraph 6 of Annex A to the Executive Agreement between
the Government of the Federal Republic of Germany and the
Government of the United States of America concerning the

Plaintiffs' claims.  (Kerson Affidavit at ¶ 2.)  In its first
decision, on May 25, 2004, the IOM determined that the
relationships between the Ignatz Nacher and the persons bringing
the claims did not meet the Foundation's eligibility criteria.[5]

---

Foundation, "Remembrance, Responsibility and the Future,"
provides:

> The Foundation legislation will provide that
> persons who suffered loss of or damage to
> property during the National Socialist era as
> a result of racial persecution directly
> caused by German companies are eligible to
> recover under the payment system set forth in
> paragraph 11.

Paragraph 11 of Annex A provides:

> The Foundation legislation will establish a
> three-member committee for property matters
> (paragraph 6 and 7) . . . The Committee will
> not have the authority to reopen any case
> that has been finally decided by a German
> court or administrative body, or that could
> have been decided by application in time.

[5]  The International Migration Organization provided the
following definition under Eligibility:

> According to Section 13(1) of the German
> Foundation Act and Section 3(1) of the
> Supplemental Rules, a claim may be made by
> the individual who suffered the property
> loss.  If the individual is no longer alive,
> the surviving spouse and children are
> entitled to equal shares of the award.  If
> the eligible person left neither a spouse nor
> children, awards may be applied for in equal
> shares by the grandchildren, or if there are
> no grandchildren living, by the siblings.  If
> none of the above files a claim, then a claim
> may be filed by the persons named as heirs in
> the sufferer's will; those who are heirs
> according to national law or based on a court

10

(See Kerson Affidavit, Exhibit A, May 25, 2004 IOM Decision at

3.)  The IOM further provided:

      A.  The German Foundation Act was
enacted to compensate, among other things,
property losses that were caused in
connection with the essential, direct, and
harm-causing participation of a German
enterprise.  It was not created to give a
second opportunity to those who could and/or
should have participated in prior German
compensation programs . . . .  Those who were
eligible to participate in one of those
programs are specifically excluded by the
German Foundation Act from receiving
compensation under the current program,
regardless of whether or not they did make a
claim.
      The Claimant has or had his/her domicile
or permanent residence in the Federal
Republic of Germany or in a country whose
government has had diplomatic relations with
the Federal Republic of Germany.  Therefore,
the Claimant could have already filed a claim
in one of the prior German compensation
programs.
      The Commission must therefore deny the
Claim for compensation for the property
loss(es) referenced above.

      B.  The Claimant did not submit
documentation indicating that the property
loss(es) . . . was/were caused in connection
with the essential, direct, and harm-causing
participation of a German enterprise.

      . . . .

      Although the Claimant alleges in the
Claim File that the property loss(es)
referenced above was/were suffered with the

_____

      decision (but not according to a will) are
      not eligible.
(Kerson Affidavit, Exhibit A, May 25, 2004 International
Organization for Migration Decision at 3.)

> essential, direct and harm-causing
> participation of a German enterprise, there
> is no proof whatsoever of German enterprise
> involvement.  The Commission finds that
> despite the application of a relaxed standard
> of proof, and in light of the time and place
> of loss and the nature of the property that
> was lost, the Claimant has not credibly
> demonstrated that the property loss(es)
> referenced above was/were caused in
> connection with the essential, direct and
> harm-cauing participation of a German
> enterprise.  The Commission must therefore
> deny the Claim for compensation for the
> loss(es) . . . .

(Id. at 4-5 (internal citations omitted).)

On August 24, 2004, Plaintiffs filed a Request for
Reconsideration challenging the eligibility requirements and for
manifest error.  (See Kerson Affidavit, Exhibit B, July 18, 2005
IOM Decision at 1, 3.)  Plaintiffs argued "that the loss
inflicted occurred due to a major role played directly by a
German company, namely Dresdner Bank and . . . no compensation
has neither been paid to date nor could have been paid for the
loss."  (Id. at 3.)  On July 18, 2005, the IOM affirmed its
initial decision.  (Id.)

### D.  Revival of Plaintiffs' Claims in this Court

Plaintiffs reappear in this Court to set aside their
December 19, 2000 Stipulation of Dismissal with Prejudice
pursuant to Fed. R. Civ. P. 60(b).  The motion is premised upon
the Court's concern, expressed in In re Nazi Era Cases Against
German Defendants Litigation, 198 F.R.D. 429 (D.N.J. 2000), that
the Plaintiffs in the consolidated cases could have been left

12

with no avenue for relief absent sufficient funding of the
foundation established to provide compensation to the surviving
victims of Nazi-era offenses.  <u>Id.</u> at 446-47.  Plaintiffs ask
that this Court "vacate the IOM decision as it applies to the
Nacher Family, and . . . set a firm date for the trial" and "to
set aside the IOM's erroneous findings."  (Kerson Affidavit at ¶
19; Mandowsky Affidavit at ¶¶ 7, 9.)

## II. DISCUSSION

Rule 60(b) empowers courts to relieve a party from final
judgment for the following reasons:

> (1) mistake, inadvertence, surprise, or
> excusable neglect; (2) newly discovered
> evidence . . .; (3) fraud . . .,
> misrepresentation, or other misconduct of an
> adverse party; (4) the judgment is void; (5)
> the judgment has been satisfied, released, or
> discharged, or a prior judgment upon which it
> is based has been reversed or otherwise
> vacated, or it is no longer equitable that
> the judgment should have prospective
> application; or (6) any other reason
> justifying relief from the operation of the
> judgment.

Fed. R. Civ. P. 60(b).

The Third Circuit held in <u>Coltec Industries, Inc. v.</u>
<u>Hobgood</u>, that "[t]he general purpose of Rule 60(b) . . . is to
strike a proper balance between the conflicting principles that
litigation must be brought to an end and that justice must be
done."  280 F.3d 262, 271 (3d Cir. 2002) (citing <u>Boughner v.</u>
<u>Sec'y of Health, Educ. & Welfare</u>, 572 F.2d 976, 977 (3d Cir.
1978)).  Relief pursuant to Rule 60(b) is available to the movant

13

"only under such circumstances that the 'overriding interest in the finality and repose of judgments may properly be overcome.'" Harris v. Martin, 834 F.2d 361, 364 (3d Cir. 1987) (quoting Martinez-McBean v. Gov't of the Virgin Islands, 562 F.2d 908, 913 (3d Cir. 1977)).  "The remedy provided by Rule 60(b) is extraordinary, and only special circumstances may justify granting relief under it." Tischio v. Bontex, Inc., 16 F. Supp. 2d 511, 533 (D.N.J. 1998) (quoting Moonlenaar v. Government of the Virgin Islands, 822 F.2d 1342, 1346 (3d Cir. 1987)). Accordingly, "[m]otions under Rule 60(b) may not generally substitute for an appeal." Harris, 834 F.2d at 364 (quoting Marshall v. Bd. of Ed. Bergenfield, NJ, 575 F.2d 417, 424 (3d Cir. 1978)).  Rule 60(b) is not a vehicle to revisit an unsatisfying ruling, it "may only be granted under extraordinary circumstances where, without such relief, an extreme and unexpected hardship would occur." Sawka v. Healtheast, Inc., 989 F.2d 138, 140 (3d Cir. 1993).  "[W]hen, as in this case, the [movants] made a free, calculated and deliberate choice to submit to an agreed upon decree rather than seek a more favorable litigated judgment, their burden under Rule 60(b) is perhaps even more formidable than had they litigated and lost." United States Steel Corp. v. Fraternal Asso. of Steel Haulers, 601 F.2d 1269, 1274 (3d Cir. 1979).

Plaintiffs' motion must be denied for three reasons: (1)

14

Rule 60(b) is not designed to release a litigant of a freely
chosen litigation strategy, (2) Rule 60(b) is not available when
granting relief would ultimately prove futile, and (3) for
broader public interests.

**A.   Plaintiffs Exercised Their Free, Calculated, and
Deliberate Choice to Voluntarily Dismiss With Prejudice**

Seeking restoration of their cause of action under Rule
60(b)(6), Plaintiffs maintain that "[t]he clear intention [of the
Foundation] was to provide a mechanism for awarding compensation
to the Nacher Family.  That was, is and remains a primary goal of
the Governments of the United States and Germany that set up the
Foundation to begin with."  (Plaintiffs' Reply Memorandum at 2-
3.)  Plaintiffs contend that the Foundation failed because it did
not recompense the Nacher family and, therefore, their voluntary
dismissal "must be found to be involuntary in all respects [and
it] must be vacated."  (Id. at 7, 13.)

In In re Nazi Era Cases Against German Defendants
Litigation, the Court explicitly stated its concern "that full
funding of the Foundation might never be achieved . . . and for
[that] reason all of the Orders of Dismissal (with the consent of
the parties) were made expressly subject to Federal Rule of Civil
Procedure 60(b)."  198 F.R.D. at 447-48 (emphasis added).
Contrary to Plaintiffs' belief, the revival of their voluntarily
dismissed action pursuant to the Court's Rule 60(b) power is not
triggered by their inability to obtain relief through the

15

Foundation.  Rather, the possibility of relitigating this matter became moot once the Foundation became fully operational in June 2001.  <u>See</u> 213 F. Supp. 2d at 445-46.  "There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from."  <u>Ackermann v. United States</u>, 340 U.S. 193, 198 (1950); <u>Coltec</u>, 280 F.2d at 275 ("even if [plaintiff's] decision to settle was improvident in hindsight, the decision has been made and cannot be revisited.").

Plaintiffs' single and unsupported allegation that their dismissal was not voluntary because "Mr. Mandowsky was subject to pressure by Prof. Burt Neuborne" is not enough to establish an extraordinary circumstance resulting in unexpected hardship. (Plaintiffs' Reply Memorandum at 8; <u>see also</u> Kerson Affidavit Ex. J, Neuborne Memorandum.)  Professor Neuborne <u>advised</u> Plaintiff Mandowsky on pursuing claims with the Foundation with the consent of Mandowsky's counsel.  (<u>Id.</u>)  Recognizing the "discretionary administrative proceedings dealing with East German real estate that [Plaintiff Mandowsky] [had] already commenced," Professor Neuborne explained his belief that this Court would dismiss this lawsuit on the basis of the 1950's release even as to the East German properties.  (<u>Id.</u>)  He wrote, "[i]nvoluntary dismissal in an American court on the merits on the basis of the 1950's release might injure the ability to process claims in Germany.  I do not know what the consequence of a foreign dismissal based on

a release would be on the discretionary German administrative proceedings - but it certainly can't be good.  Nor do I know how the Foundation would treat a claim that had been judicially found by an American court to have been released.  My guess is that the claim would be rejected."  (Id.)  Professor Newborne warned Plaintiff Mandowsky that "[w]ith all its uncertainties and flaws . . . [Plaintiff] had a better chance to recover in the Foundation than in an American court . . . though, that [he] did not know . . . what effect the 1950's release might have."  (Id.)

Furthermore, there is no indication that Professor Neuborne's purported assurances were binding on the Foundation. In fact, the lone memorandum submitted by Plaintiffs in support of this allegation, indicates that Professor Newborne told Plaintiff Mandowsky that "[he] had no expertise concerning [Plaintiffs'] case," that "[his] primary loyalty [was] to the German Foundation," and that "as a trustee of the Foundation, [he] was personally committed to assuring fair treatment for property claimants like [Plaintiff], but that no guarantees were possible."  (Kerson Affidavit Ex. J, Neuborne Memorandum (emphasis added).)

Plaintiff Mandowsky's reliance on Professor Neuborne's advice does not translate into the kind of grave consequences contemplated under Rule 60(b)(6).  See Klapprott v. United States, 335 U.S. 601 (1949); Liljeberg v. Health Servs.

17

<u>Acquisition Corp.</u>, 486 U.S. 847, 864 (1988) ("[Rule 60(b)(6)]
should only be applied in 'extraordinary circumstances.'"); <u>id.</u>
at 873 (Rehnquist, C.J., dissenting) ("This very strict
interpretation of Rule 60(b) is essential if the finality of
judgments is to be preserved."). As this Court explained, the
Plaintiffs litigating their cases in the United States "were
given a choice. They could either voluntarily dismiss their
claims with prejudice, and file claims for compensation with the
German Foundation, or they could continue to pursue litigation."
213 F. Supp. 2d at 443-44. Moreover, Plaintiff Mandowsky is a
sophisticated party, represented by both domestic and German
counsel.

　　　Based on the record, his reliance on the advice of Professor
Neuborne appears facially sound, and cannot now be used to
undermine an evenhanded settlement. The denial of relief by a
foreign tribunal cannot serve as a basis for rescinding the
decision to dismiss.

**B.   The Relief Sought By Plaintiffs Would Ultimately Prove
　　　Futile**

　　　Dresdner Bank correctly argues that reopening Plaintiffs'
voluntarily dismissed action would be a futile exercise.
Although the Third Circuit has not conclusively ruled on the
issue, it is well-established in other Circuit Courts of Appeals
that a Rule 60(b) movant "must show a 'meritorious' claim or
defense." 12 James Wm. Moore et al., Moore's Federal Practice ¶

18

60.24[2] (3d ed. 2006); see also Lasky v. Continental Products
Corp., 804 F.2d 250, 256 & n.10 (3d Cir. 1986) (in dicta, citing
to Moore's Federal Practice regarding other "'relevant factors
and propositions,' that the district court may consider in
exercising its discretion on a Rule 60(b) motion" including
"whether there is merit in the defense or claim," but noting that
those factors were not applicable in Lasky); see, e.g., Lepkowski
v. United States Dept. of Treasury, 804 F.2d 1310, 1314 (D.C.
Cir. 1986) ("motions for relief under Rule 60(b) are not to be
granted unless the movant can demonstrate a meritorious claim or
defense"); cf. Local 59 v. Superline Transp. Co., 953 F.2d 17, 21
(1st Cir. 1992) ("while a movant, in order to set aside a
judgment, need not establish that it possesses an ironclad claim
or defense which will guarantee success at trial, it must
establish a potential meritorious claim or defense which, if
proven, will bring success").

    Plaintiffs who have pursued their Holocaust-related claims
within the United States courts have faced ineluctable motions to
dismiss and for summary judgment based on, inter alia, the
political question doctrine and international comity.  213 F.
Supp. 2d at 444 (noting that Plaintiffs who "opted against the
Foundation and continued to pursue relief through litigation . .
. would be confronted by defendants' motions to dismiss supported
by the United States' Statement of Interest, advocating dismissal

19

'on any valid legal ground'"); see e.g., Sampson v. Fed. Republic
of Germany & Claims Conf., 250 F.3d 1145 (2d Cir. 2001)
(affirming dismissal against Germany based on sovereign
immunity); Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227,
1236 n.12 (11th Cir. 2004) (affirming dismissal based on
international comity but disagreeing with this Court's holding in
Frumkin v. JA Jones, Inc. (In re Nazi Era Cases Against German
Defendants Litigation) and finding that "[a]lthough the
executive's statement of interest is entitled to deference, it
does not make the litigation non-justiciable"); Whiteman v.
Dorotheum GmbH & Co KG, 431 F.3d 57, 71-72 n.16 (2d Cir. 2005)
(disagreeing with the 11th Circuit's reasoning in Ungaro-Benages
and expressing its view that the political question doctrine
might apply in a factually similar case involving the Republic of
Austria); Wortham v. Karstadtquelle AG, No. 04-2848 (3d Cir. Oct.
20, 2005) (per curiam) (affirming this Court's dismissal of the
complaint for lack of personal jurisdiction); Frumkin v. JA
Jones, Inc. (In re Nazi Era Cases Against German Defendants
Litigation), 129 F. Supp. 2d 370, 372, 373 n.4 (D.N.J. 2001)
(dismissing forced labor suit on the grounds that claims
presented nonjusticiable political questions, and in the interest
of international comity); Gross v. German Found. Indus.
Initiative (In re Nazi Era Cases Against German Defendants
Litigation), 320 F. Supp. 2d 235 (D.N.J. 2004) (dismissing suit

20

concerning settlement interest obligations because the claims were nonjusticiable as a result of the political question doctrine); <u>Rozenkeir v. Schering AG (In re Nazi Era Cases Against German Defendants Litigation)</u>, 334 F. Supp. 2d 690 (D.N.J. 2004) (dismissing medical experimentation suit on the ground of nonjusticiability), <u>appeal docketed</u>, No. 04-3934 (3d Cir. Oct. 13, 2004).

If this Court were to grant Plaintiffs' requested relief, it would be faced with Dresdner Bank's motion to dismiss pending at the time of Plaintiffs' Stipulation of Dismissal.[6]  <u>See</u> 213 F.

------

[6]  Since Plaintiffs request the Court to vacate the IOM's decision and return this case to the Court's trial calendar, the Court assumes Plaintiffs have abandoned their cross-motion to remand this suit to the New York state courts.  Dresdner Bank's motion presented the following grounds for dismissal:

> 1. <u>Political Question and Comity</u>.  This case is not justiciable because it presents political questions which no United States court may decide.  This Court should also abstain from adjudicating this case under principles of comity. . . .

> 2. <u>Settlement/Accord and Satisfaction/ Release</u>.  The claim asserted was conclusively settled years ago in 1956 and was released in the 1956 Settlement.

> 3. <i>Res Judicata</i>.  The action is barred by <i>res judicata</i> because: (A) the 1956 Settlement was expressly confirmed by the Berlin court in which the Estate had asserted its claim, (B) after the reunification of Germany, the Estate pursued a claim again in Berlin to avoid the 1956 Settlement and that claim was dismissed by a judgment of the Berlin court in 1993, and (C) <i>the claim has now been</i>

21

Supp. 2d at 451 (citing <u>Shaffer v. Gte N.</u>, 284 F.3d 500, 503 (3d
Cir. 2002)).  The Court would have to consider the impact of the
1956 settlement agreement, the Berlin Court's dismissal, and the
denial of claims by the Foundation.

> **1.   This Case Presents a Nonjusticiable Political
>         Question**

Plaintiffs demur to Dresdner Bank's view that this lawsuit
is a foregone conclusion.  (<u>See</u> Plaintiffs' Reply Memorandum at
9-12; Plaintiffs' Oct. 25, 2000 Memorandum of Law in Support of
Their Motion for Remand and in Opposition to Defendant's Motion
to Dismiss at 25-36.)  Their insistence that Dresdner Bank is
frustrating "the clear intention of the U.S. Deputy Treasury
Secretary . . . to compensate the Nacher Family," (<u>see</u>
Plaintiffs' Reply Memorandum at 10), however, does not take this
case out of the realm of issues already covered by <u>Frumkin v.
Jones (In re Nazi Era Cases Against German Defendants
Litigation)</u>, in which this Court agreed with two similar cases,
<u>Burger-Fischer v. Degussa AG</u>, 65 F. Supp. 2d 248, 267 (D.N.J.
1999) and <u>Iwanowa v. Ford Motor Co.</u>, 67 F. Supp. 2d 424 (D.N.J.

---

> *rejected twice by the Foundation in Germany*.
>
> 4. <u>Statute of Limitations and Laches</u>.  Even
> if, *arguendo*, the claim had not been settled
> and released in 1956, the claim was long ago
> barred by the applicable statute of
> limitations and the doctrine of laches.

(Dresdner Bank's Memorandum in Opposition at 12) (emphasis in
original.)

1999), "that the claims of individual plaintiffs against private German defendants were no longer properly justiciable in American courts."  129 F. Supp. 2d at 378.   Although <u>Burger-Fischer</u>, <u>Iwanowa</u>, and <u>Frumkin</u> concerned allegations of slave labor rather than property claims, those conclusions ring no less true here.[7] "For almost 60 years now, U.S. courts have held consistently that the political question doctrine made Holocaust-era claims nonjusticiable."  <u>Gross</u>, 320 F. Supp. 2d at 253 (D.N.J. 2004).

Moreover, the United States submitted a Statement of Interest "taking no position on the merits of the underlying claims or arguments" but urging dismissal of this case.  (<u>See</u> Statement of Interest at 2; February 10, 2006 Dept. of Justice Letter to Court confirming "that the Statement of Interest of the United States filed on October 23, 2000 in the MDL proceeding is still considered part of the record in this individual action.") The Statement of Interest provides:

> The President of the United States has
> concluded that it would be in the foreign
> policy interests of the United States for the
> Foundation to be the exclusive forum and
> remedy for the resolution of all asserted
> claims against German companies arising from
> their involvement in the Nazi era and World
> War II, including without limitation those
> relating to compensation for slave and forced

---

[7]  To be sure, the Foundation provides an avenue for relief for property claims.  As the United States notes in its Statement of Interest that "[i]ndividuals who had property 'aryanized' or otherwise stolen or damaged by German companies . . . are eligible to receive payments."  (Statement of Interest at 9.)

> labor, "aryanization" or other confiscation
> of, damage to, or loss of property (including
> banking assets and insurance policies) . . .
> Accordingly, the United States believes that
> all asserted claims should be pursued through
> the Foundation instead of the courts.

(Id. at 14-15.)

Any conclusion other than that the situation presented implicates the political question doctrine would run afoul of this Court's previous ruling in Frumkin and under Supreme Court precedent.[8]  See 129 F. Supp. 2d at 382-83.  Although the Circuit Courts of Appeals have reached differing conclusions on the impact of the government's Statement of Interest,[9] regardless of

_____

[8] The political question doctrine dictates that a court refuse to adjudicate a claim upon which there is

> a textually demonstrable constitutional
> commitment of the issue to a coordinate
> political department; or a lack of judicially
> discoverable and manageable standards for
> resolving it; or the impossibility of
> deciding without an initial policy
> determination of a kind clearly for
> nonjudicial discretion; or the impossibility
> of a court's undertaking independent
> resolution without expressing lack of the
> respect due coordinate branches of
> government; or an unusual need for
> unquestioning adherence to a political
> decision already made; or the potentiality of
> embarrassment from multifarious
> pronouncements by various departments on one
> question.

Baker v. Carr, 369 U.S. 186, 217 (1962).

[9] As previously noted, the Eleventh Circuit that the Government's Statement of Interest alone does not render a case nonjusticiable, providing:

> [T]he plain text of the Foundation

how this issue ultimately unfolds in the Third Circuit,
Plaintiffs' case still presents concerns under international
comity.

### 2.   This Case Raises International Comity Concerns

International comity is "the recognition which one nation
allows within its territory to the legislative, executive, or
judicial acts of another nation, having due regard both to
international duty and convenience, and to the rights of its own
citizens or of other persons who are under protection of its
laws." Hilton v. Guyot, 159 U.S. 113, 163-64 (1895); see also
Stonington Partners v. Lernout & Houspie Speech Prods. N.V., 310

---

Agreement anticipates that federal courts
will consider claims against German
corporations . . . . [T]he Agreement itself
provides that it does not provide an
independent legal basis for dismissal.  Thus,
the executive opted not to settle these
claims or to transfer the claims to the
Foundation, although it had the power to do
so.
    As a result, federal court consideration
of the present case does not reflect a lack
of respect for the executive nor does it
interfere with American foreign relations.
The United States is in full compliance with
the Foundation Agreement so long as it files
a statement of interest to courts urging
respect for the Foundation as the exclusive
forum to resolve these claims . . . . A
statement of national interest alone,
however, does not take the present litigation
outside of the competence of the judiciary.
Ungaro-Benages, 379 F.3d at 1235-36 (citation and footnote
omitted) (also cited in Judge Straub's dissent in Whiteman, 431
F.3d at 62 (Straub, J., dissenting)); but see Whiteman, 431 F.3d
at 71-72 n. 16.

F.3d 118, 126 (3d Cir. 2002); <u>Frumkin</u>, 129 F. Supp. 2d at 386.
There is perhaps no case more deserving of the "practice,
convenience, and expediency" of international comity than one in
which the decisive issues have been consistently and competently
resolved by foreign courts.  <u>See</u> <u>Somportex, Ltd. v. Philadelphia</u>
<u>Chewing Gum Corp.</u>, 453 F.2d 435, 440 (3d Cir. 1971).  "Every
sovereign State is bound to respect the independence of every
other sovereign State, and the courts of one country will not sit
in judgment on the acts of the government of another done within
its own territory.  Redress of grievances by reason of such acts
must be obtained through the means open to be availed of by
sovereign powers as between themselves."  <u>Oetjen v. Central</u>
<u>Leather Co.</u>, 246 U.S. 297, 303 (1918) (citing <u>Underhill v.</u>
<u>Hernandez</u>, 168 U.S. 250, 252 (1897)); 129 F. Supp. 2d at 388.
"[A] court may, within its discretion, deny comity to a foreign
judicial act if it finds that the extension of comity 'would be
contrary or prejudicial to the interest of the' United States."
<u>Philadelphia Gear Corp. v. Philadelphia Gear, S.A.</u>, 44 F.3d 187,
191 (3d Cir. 1994); 129 F. Supp. 2d at 387.  "Additionally, a
court must evaluate whether a true conflict exists between the
law of the United States and that of a foreign jurisdiction."
129 F. Supp. 2d at 387 (citing <u>Hartford Fire Ins. Co. v.</u>
<u>California</u>, 509 U.S. 764, 798 (1993)).

        Plaintiffs ask this Court to "vacate the IOM decision," to

ignore the Berlin Court's 1993 decision, and with regard to the 1956 settlement, to rule that "East German assets . . . were not included in the . . . agreement" because "West Germany had no jurisdiction or competence over claims in East Germany." (Kerson Affidavit at ¶ 19; Plaintiffs' Reply Memorandum in Support of Remand and in Opposition to Defendant's Motion to Dismiss at 5; Plaintiffs' November 16, 2000 Letter to This Court Regarding Oral Argument; Plaintiffs' Reply Memorandum in Support of Remand and in Opposition to Defendant's Motion to Dismiss at 5.)  The principles of international comity, however, would compel this Court to refrain from considering the merits of Plaintiffs' allegations.  The United States' Statement of Interest expresses the government's view that this lawsuit would interfere with the ultimate success of the Foundation. (See Statement of Interest at 2.)  "The United States government has consistently supported the Foundation as the exclusive forum for the resolution of litigation against German corporations related to their acts during the National Socialist era." Ungaro-Benages, 379 F.3d at 1239.  Since the government has announced that the German government and its administrative instrumentalities is best suited to deal with "the twin concerns of justice and urgency," (Statement of Interest at 2), underlying these claims, and since the German courts and the Foundation through the IOM have decided the issues openly and fairly, were this Court to sit in quasi-

27

appellate review of those decisions it would violate the
quintessential standards of international comity.  It is
impossible to both support the operation of the Foundation and
enter a judgment in Plaintiffs' favor; therefore, in keeping with
its opinion in <u>Frumkin</u>, this Court would likely abstain under the
doctrine of international comity.  <u>See</u> 129 F. Supp. 2d at 386-88.

**C.   Public Policy Interests Weigh In Favor of Denying
     Plaintiffs' Motion**

The Third Circuit recognizes a strong public policy favoring
settlements of disputes, the finality of judgments and the
termination of litigation.[10]  <u>See</u> <u>American Iron & Steel Institute</u>
<u>v. Environmental Protection Agency</u>, 560 F.2d 589 (3d Cir. 1977);
<u>Pennwalt Corp. v. Plough, Inc.</u>, 676 F.2d 77, 80 (3d Cir. 1982);
<u>Lasky</u>, 804 F.2d at 256 & n.10 (3d Cir. 1986); <u>Bank of America</u>
<u>National Trust and Savings Assoc. v. Hotel Rittenhouse Assocs.</u>,
800 F.2d 339, 344 (3d Cir. 1986); <u>Eckersley v. WGAL TV Inc.</u>, 831
F.2d 1204, 1209 (3d Cir. 1987); <u>Keystone Shipping Co. v. Home</u>
<u>Ins. Co.</u>, 840 F.2d 181, 184 (3d Cir. 1988); <u>State of New Jersey</u>

---

[10]  "Unlike typical international agreements, the Agreement
between the Governments of the Federal Republic of Germany and
the United States of America concerning the Foundation
'Remembrance, Responsibility and the Future' is not a government-
to-government claims settlement agreement.  Rather than
extinguishing the legal claims of its nationals or anyone else,
the United States merely helped facilitate an agreement between
victims, German Industry, and the German Government.  By acting
in this manner, the United States' goal was to bring expeditious
justice to the widest possible population of survivors, and to
help facilitate legal peace."  198 F.R.D. at 434.

Department of Environmental Protection v. Gloucester
Environmental Management Services, Inc., 668 F. Supp. 404, 407
(D.N.J. 1987); Johnston Dev. Group, Inc. v. Carpenters Local
Union No. 1578, 728 F. Supp. 1142, 1148 (D.N.J. 1990).
"Voluntary settlement of civil controversies is in high judicial
favor.  Judges and lawyers alike strive assiduously to promote
amicable adjustments of matters in dispute, as for the most
wholesome of reasons they certainly should."  Pennwalt, 676 F.2d
at 80.  Indeed, "[p]ublic policy dictates that there be an end to
litigation; that those who have contested an issue shall be bound
by the result of the contest . . . [There is] no reason why this
doctrine should not apply in every case where one voluntarily
appears, presents his case and is fully heard, and why he should
not, in the absence of fraud, be therefore concluded by the
judgment of the tribunal to which he has submitted his cause."
Baldwin v. Iowa State Traveling Men's Asso., 283 U.S. 522, 526
(1931).

    Plaintiffs essentially argue that they should not be bound
by their settlement with Dresdner Bank or by the consistent
conclusions of the other tribunals that have heard and denied
their claims.  But allowing Plaintiffs to come back to this Court
and challenge the IOM's decision after voluntarily dismissing
their lawsuit would undermine the "legal peace" that resulted in
the Foundation's creation and it would open the proverbial

floodgates to relitigation of similar claims.  The fact that Plaintiffs voluntarily dismissed their suit to avail themselves of an alternative forum, of which they actively took part in, solidifies this Court's conclusion that Plaintiffs got what they bargained for - an opportunity to present their claims with the Foundation.

## III. CONCLUSION

For the reasons set forth above, Plaintiffs' motion is **denied**.

An appropriate Order follows.

 /s/ William G. Bassler
WILLIAM G. BASSLER, U.S.S.D.J.

Dated: July 5, 2006

30